48 P.3d 324 (2002)
111 Wash.App. 771
DEPARTMENT OF LABOR AND INDUSTRIES OF THE STATE of Washington, Appellant,
v.
KAISER ALUMINUM AND CHEMICAL CORPORATION, Respondent.
No. 19965-7-III.
Court of Appeals of Washington, Division 3, Panel Six.
April 4, 2002.
As Amended on Grant of Reconsideration May 30, 2002.
Publication Ordered May 30, 2002.
*326 Bourtai Hargrove, Assistant Attorney General, Olympia, for Appellant.
Douglas B. Ehlke, Federal Way, for Respondent.
*325 SWEENEY, J.
The Washington State Department of Labor and Industries seeks review of a superior court decision that affirmed the dismissal by the Board of Industrial Insurance Appeals of four violations of various general Washington State safety regulations. The citation followed the accidental death of a Kaiser Aluminum and Chemical Corporation plant worker, James VanDoren. He suffocated when he was trapped between the cab and the bucket of a small front-end loader. The bucket (apparently) slowly descended and compressed him against the cab of the loader.
The Department cited Kaiser for a number of safety violations centered on the use of heavy-gauge steel angle iron to support the bucket of a Bobcat (a small front-end loader) during maintenance and repair. The administrative law judge (ALJ) dismissed four of the five serious violations. The Board of *327 Industrial Insurance Appeals and the superior court affirmed. The ALJ found the practice of using angle iron to support the bucket both widely accepted in the industry and safe. This record amply supports the ALJ's findings, and those findings amply support the conclusions and order dismissing these violations. And we therefore affirm.

FACTS
THE PARTICIPANTS
James VanDoren was an experienced journeyman mechanic. Mr. VanDoren was particularly experienced in the maintenance and repair of moving equipment, including the Bobcat skid steer loader responsible for his accident. The employer was Kaiser Aluminum and Chemical Corporation, for whom Mr. VanDoren worked at Kaiser's plant in Mead, Washington. Melroe Corporation manufactures the Bobcat. The Department of Labor and Industries is the state agency that enforces workplace safety and health regulations in Washington.
THE EQUIPMENT
The Bobcat is a small, four-wheeled, selfpropelled, front-end-type loader. Structurally, it consists of a protected cab, and a bucket attached to two sidearms on either side of the cab, which raise and lower the bucket. Two hydraulic cylinders raise and lower the bucket, which rests against the front of the cab when in its lowered position. An operator sits inside the cab and raises and lowers the bucket with foot controls. Although the vehicle itself is small, the bucket weighs over 500 pounds.
THE ACCIDENT
In order to access hydraulic lines for repairs, a mechanic must secure the bucket in an elevated position. This is done by hooking a chain to the bucket and securing it from above with a chain hoist. For additional protection, the mechanic then wedges a support device between the hydraulic piston and the bucket. The manufacturer provides a support device for this purpose. But the manufacturer's device is easily damaged. Angle iron is stronger, heavier, and can be cut to exact lengths to achieve the desired degree of elevation for repairs. Angle iron is used routinely throughout the industry.
Mr. VanDoren was repairing one of Kaiser's Bobcats. Accident reconstruction experts testified that after he had completed work on the Bobcat, Mr. VanDoren removed all support devices, including the angle iron, the chain hoist, and the jack stands. The jack stands had been used to prop up the rear wheels on the Bobcat. He also appears to have bypassed several built-in safety mechanisms, such as that requiring an operator to be sitting in the cab, while applying finishing touches to the repair. The bucket apparently slowly descended, compressed Mr. VanDoren against the cab of the Bobcat, and suffocated him. Medical examiners found no broken bones or crush injuries.
THE CITATION
The Department investigated the accident. An enforcement inspector assumed that the angle iron failed (a bent piece of angle iron was found near the scene) and cited Kaiser for five serious violations of the Washington Administrative Code requiring adequate safety hardware, written procedures, and training.
HEARING AND APPEALS
Kaiser appealed the citation. An ALJ summarily dismissed the first violation, which consisted of two parts, alleging inadequate lift-arm support hardware. He based the dismissal on undisputed facts and the Department's pretrial admissions. The Department admitted that angle iron was well accepted and consistently used by mechanics in the industry, including the local Bobcat distributor.
The Department and Kaiser presented conflicting expert reconstructions of the accident. The Department hired a mechanical engineer. This witness assumed, first of all, that all of the hydraulic fluid had been drained from the hydraulic lines. This would allow the bucket to freely fall. He further assumed that the angle iron used as a lift-arm support had not been properly placed, so that the force of the falling bucket struck the angle iron on an edge, rather than directly. The Department's expert concluded that the *328 angle iron had disengaged, resulting in a sudden, powerful drop of the bucket due to the lack of hydraulic fluid. The fall crushed Mr. VanDoren.
Kaiser's expert reached a different conclusion based on different assumptions. Kaiser's expert demonstrated that it was more likely that Mr. VanDoren had completed the repairs and was finishing the job. He theorized that Mr. VanDoren disengaged the chain hoist and removed the angle iron. The hydraulic system was charged with fluid. And therefore the hydraulic system would have supported the bucket. According to this reconstruction of the accident, Mr. VanDoren used wrenches found on the floor of the cab to bypass design safeguards in the Bobcat by wedging them under a pedal which operated the bucket. Kaiser's expert hypothesized that Mr. VanDoren inadvertently knocked one of the wrenches loose, allowing the bucket to begin descending slowly (and silently). It compressed him against the cab of the Bobcat and suffocated him.
The ALJ found that Kaiser's version of events was most consistent with the evidence found at the scene of the accident (the hydraulic system was charged; wrenches were found near the foot controls) and with the medical opinions on the cause of death (suffocation). If the Department's theory were correct, the sudden, catastrophic falling of the bucket would have resulted in crushed bones and internal organs. And this did not happen.
The relevant Washington Administrative Code section requires only that the employer provide adequate safety hardware. The ALJ ruled that Kaiser's use of angle iron satisfied the regulation as a matter of law. Despite summarily dismissing the two parts of the first violation, the ALJ admitted extensive evidence (over Kaiser's objection) on the propriety of using angle iron to support the bucket. He then entered extensive findings of fact and conclusions of law, and dismissed the remaining violations with the exception of one training violation.
The Department appealed to the Board of Industrial Insurance Appeals. The Board adopted the ALJ's findings with only slight modification and issued a decision and order affirming. The Department appealed to the superior court. The superior court affirmed the Board. The court found that the Board's findings were amply supported by substantial evidence, and that those findings supported the conclusions and the dismissal of these violations.

USE OF ANGLE IRON AS ENERGYISOLATING HARDWARE
Violation 1-1a: "The employer did not provide adequate energy-isolating devices to safely support skid steer loader lift arms, exposing garage mechanics to crush hazards between skid steer loader frames and raised portions of the equipment." Certified Appeal Board Record (CABR) at 87.
Violation 1-1b: "The employer did not ensure manufacturer's approved safety devices were maintained, made available and used, for example the lift arm support device for skid steer loader 798." CABR at 88.
CONTENTIONS OF THE PARTIES
The Department reads WAC 296-24-11005(5)(a)[1] and WAC 296-24-073(2)[2] as requiring the use of only the manufacturer-supplied bucket arm supports. It contends that this worker was accidentally killed because stored energy (the raised bucket) was expended (when the bucket fell). This was caused by the failure to support the bucket *329 with the manufacturer's approved energy-isolating device.
The Department also takes issue with the ALJ's reliance on the fact that the Department had never previously cited any employer for using angle iron as an energy-isolating device. And, specifically, that the Department had never cited Kaiser for failing to use the manufacturer's device for supporting the Bobcat bucket, notwithstanding numerous safety inspections.
Kaiser responds that the ALJ correctly concluded that use of angle iron to support Bobcat buckets is a reasonable safety precaution, well accepted throughout the industry, and that the manufacturer's device is not necessary to comply with these regulations.
STANDARD OF REVIEW
Summary judgment is appropriate if, viewing the pleadings, admissions, depositions and affidavits and all reasonable inferences therefrom in the light most favorable to the nonmoving party, there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Smith v. Employment Sec. Dep't, 100 Wash. App. 561, 568, 997 P.2d 1013 (2000). A material fact is one upon which the outcome of the case depends, in whole or in part. Morris v. McNicol, 83 Wash.2d 491, 494, 519 P.2d 7 (1974). We review summary judgments de novo. We engage in the same inquiry as the decision maker. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982).
We will uphold the ALJ's findings of disputed fact, if they are supported by substantial evidence. Nat'l Realty & Constr. Co. v. Occupational Safety & Health Review Comm'n, 489 F.2d 1257, 1263 n. 24 (D.C.Cir. 1973).
When answers to unambiguous interrogatories clearly eliminate any genuine issue of material fact, a party cannot thereafter create such an issue merely by contradicting, without explanation, previous admissions. Marshall v. AC & S, Inc., 56 Wash. App. 181, 185, 782 P.2d 1107 (1989) (citing Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984)).
ALJ'S DECISION
The ALJ first concluded that the hardware violations were unsupportable as a matter of law and dismissed them on Kaiser's motion for summary judgment. An exhaustive evidentiary hearing followed, ostensibly on the remaining violations for deficient written safety procedures, equipment inspections, and training practices. The ALJ admitted extensive evidence on the adequacy of Kaiser's Bobcat safety hardware and, more importantly, the cause of Mr. VanDoren's death. The net effect was that the Department received a full evidentiary hearing. The ALJ then entered detailed findings and conclusions on the hardware violation issues.
So, under either a de novo or substantial evidence standard, we affirm the superior court's judgment affirming the Board's decision, which in turn affirmed the summary dismissal of these violations. No issue of material fact remains in controversy.
LOCKOUT/TAGOUT
WAC 296-24-11005(5)(a) is also called the "lockout/tagout" provision, known in the trade as LO/TO. This refers to the requirement that "[l]ocks, tags, chains, wedges, ... or other hardware shall be provided by the employer for isolating, securing, or blocking of machines or equipment from energy sources." WAC 296-24-11005(5)(a).
The Department admitted, prehearing, that Kaiser provided chain hoists, jack stands, angle iron, and the manufacturer's own device for making the Bobcat safe from free-falling buckets during repair. The ALJ determined that this satisfied the "other hardware" language as a matter of law. The ALJ also concluded that this WAC did not put employers on notice that only the manufacturer-supplied hardware was sufficient. Accordingly, the ALJ's conclusion that the term, "other hardware," included angle iron is amply supported by the findings here.
GENERAL DUTY VIOLATION
WAC 296-24-073(2) is another general duty clause. It requires employers to *330 provide a workplace free of known hazards. The employer must adopt methods and means that are "reasonably adequate" and must "do every other thing reasonably necessary to protect the life and safety of employees." WAC 296-24-073(2). General duty clauses govern in the absence of any more specific standard. Donovan v. Royal Logging Co., 645 F.2d 822, 829 (9th Cir.1981).
In order to prove a general duty violation, the Department must show the employer failed to render the workplace free of (1) a hazard, which (2) was recognized, and (3) caused or was likely to cause death or serious injury. Donovan, 645 F.2d at 829.
Here, the Department could not meet this standard, as a matter of law.
The hazard was the sudden release of stored gravitational energy created by raising the Bobcat bucket. This can, of course, result in death or serious injury. But Kaiser provided chain hoists, jack stands, angle irons, and the manufacturer's lift-arm support device. Kaiser posted the manufacturer's hazard warning decals. It provided the manufacturer's manual and its warnings. It conducted its own training on the dangers of sudden release of stored gravitational energy in general. That is, Kaiser provided reasonably adequate methods and means to avoid this hazard.
The cited hazard was the particular danger that an angle iron might fail. But the Department failed to prove that this was a hazard in the first place. The Department relied on the presumption that a man was killed because an angle iron either failed or became dislodged. The evidence was, however, overwhelming that the angle iron did its job and had nothing to do with this tragic death. The Department presented no evidence that an angle iron had ever failed or become dislodged and caused injury of any kind. In fact, the Department's prehearing admissions were to the contrary. CABR at 645, Admission 137 (no previous failure of angle iron ever reported); CABR at 627, Admission 69 (no angle iron ever reported bent); CABR at 627, Admission 68 (never dislodged); CABR at 627-28, Admissions 70, 71, 72 (never previously reported to have caused or contributed to an accident).
RECOGNIZED HAZARD
The Department was not able to show that the use of angle iron or the failure of angle iron was recognized as a hazard. The evidence in this record is that angle iron is universally used throughout the state for holding up Bobcat buckets, even by the manufacturer's Washington representative.
Moreover, the Department's answers to Kaiser's prehearing request for admissions included the unambiguous admission that angle iron is an adequate energy-isolation device. CABR at 634, Admission 94. The Department also admitted that, not only had it never heard of angle iron ever failing or causing any accident, but the manufacturer's device often failed. CABR at 644, Admission 134. The Department also admitted pretrial that it had never cited any employer ever for not using the manufacturer's device, or for using angle iron or any other substitute. CABR at 616, 620, Admissions 21, 39. Nor had it ever cited Kaiser. CABR at 617, Admission 25.
In sum, neither any other user nor the Department itself had previously recognized the use of angle iron as a hazard. In fact, there was substantial evidence not only that angle iron is perceived as adequate, but that it was the preferred method of securing Bobcat lift-arms. Report of Proceedings (RP) (June 8, 1999) at 142, 148, 157. The recognized hazard was the unsupported bucket, not the use of angle iron as a support.
The Department places great stock in a general interest article from an industry safety publication. The article discussed workplace fatalities caused by unsupported Bobcat buckets. CABR Ex. 2. The Department contends this should have put Kaiser on official notice to retrain its employees on the dangers of Bobcat buckets. But there was extensive testimony that the article was circulated for general interest, not as an official notice. We agree with the ALJ's assessment that this article was of no significance. RP (June 9, 1999) at 100.
FEASIBILITY
Finally, the Department must specify the particular steps the employer should *331 have taken to avoid the citation. The Department must demonstrate the feasibility and likely utility of those measures. Donovan, 645 F.2d at 829. The Department must also show that the proposed measure will not result in greater hazard. Id. at 830.
Here, the Department specified that the device supplied by the manufacturer must be used at all times, but made no showing of the feasibility and likely utility of this practice. The Department admitted prehearing that Kaiser had tried to order replacement devices from the manufacturer but that they had not been delivered. CABR at 644, Admission 135. The Department also admitted prehearing that the manufacturer's device was easily damaged and was frequently unavailable. CABR at 644, Admission 134. Exclusive use of the manufacturer's device appears, on this record, to be more hazardous than substituting angle iron for defective or missing units.
In Donovan, the hazard was the potential for rollover of a piece of heavy equipment called a Caterpillar tractor or "Cat," used to clear logging trails of debris and small trees. Donovan, 645 F.2d at 824. A logger was crushed to death in a rollover, and the department cited the employer for not providing a seat belt. Id. at 824-25. The court held the department failed to meet its feasibility burden, because seat belts prevented the driver from avoiding injury from flying debrisan equally prevalent danger. Id. at 830-31.
Here, the hazard is properly characterized as the danger that an unsupported bucket might fall. The abatement is hardware and training to support the bucket while working beneath it. The Department failed as a matter of law to produce any facts which, if proved, would place the employer out of compliance with this general duty regulation.
In sum, the facts the Department claims remain in dispute were either settled by a preponderance at the hearing (adequacy of angle iron) or were never disputed at all (angle iron's safety record and limited availability of the manufacturer's device). On the facts before the ALJ, then, the Department failed to support its hardware violations as a matter of law.

ADEQUACY OF WRITTEN PROCEDURES
Violation 1-2 alleged: "The employer did not adopt specific safe work practices and procedures for the service and maintenance of mobile equipment, for example the 753 series Melroe Bobcat skid steer loader." CABR at 88. The allegation was that this violated WAC 296-24-11005(4)(a): "[Energy control procedures shall be developed, documented, and utilized for the control of potentially hazardous energy when employees are engaged in the activities covered by this section."
Kaiser adopted the manufacturer's manual as its written maintenance procedures. But the Department argues that the manual specifically requires use of only the manufacturer's lift-arm support device. Therefore, Kaiser needed additional written procedures for substituting angle iron as a lift-arm support device.
We will uphold the board's findings if they are supported by substantial evidence. Nat'l Realty & Constr. Co. v. Occupational Safety & Health Review Comm'n, 489 F.2d 1257, 1263 n. 24 (D.C.Cir.1973).
The Board adopted the ALJ's findings that the written procedures were adequate. There was a great deal of evidence that written procedures are not customarily prepared for simple, daily practices that are fundamental to mechanical work. RP (June 11, 1999) at 105. For instance, there was no written procedure for using a chain hoist to hold up the bucket, RP (May 27, 1999) at 77, or jack stands, RP (June 8, 1999) at 144.
The fact finder evidently believed the testimony of numerous witnesses who compared using angle iron for holding up a bucket to using a door-stop to hold open a door, or a table to hold up a typewriter. Written procedures beyond the instruction to use a support would have been superfluous. RP (May 26, 1999) at 124, 142, 162.
Moreover, the Department's own investigator testified that he informed Kaiser that it would be in compliance with the written procedures requirement if it adopted the manufacturer's manual. RP (May 28, 1999) at 119.
*332 This record contains substantial evidence supporting the Board's decision that the written procedures were adequate.

ADEQUATE TRAINING
In violation 1-3, the Department alleged: "The employer did not provide adequate training in the methods and means necessary for the isolation and control of hazardous energy associated with the service and maintenance of mobile equipment, for example the 753 series Melroe Bobcat skid steer loaders." CABR at 89.
This was charged as a violation of WAC 296-24-11005(7)(a)(i), which requires employers to train employees to recognize hazardous energy sources and to understand the appropriate safety procedures. The Department contends that Kaiser's LO/TO training materials and records and monthly safety training meetings were not specific enough. Training materials included an elaborate simulator to demonstrate different kinds of stored energy hazards. The complaint was, however, that none of this training was specific to Bobcats and did not, therefore, meet the statutory standard.
The record amply supports the findings to the contrary. There was testimony that training for the use of angle iron as lift-arm support was adequate. RP (June 8, 1999) at 156-57; RP (June 11, 1999) at 109. In addition to on-the-job training, the mechanics attended monthly safety training sessions. RP (May 26, 1999) at 160; RP (May 27, 1999) at 53, 139.

PERIODIC INSPECTIONS
Violation 1-4 alleges: "The employer did not conduct a periodic inspection of hazardous energy control with garage mechanics to correct hazards associated with the service and maintenance of skid steer loaders." CABR at 89.
WAC 296-24-11005(6)(a)(ii) requires inspection of each work area at least once a year to identify and correct any deviations from the hazardous energy control procedures. The Department argued that Kaiser failed to conduct the required periodic inspections of procedures used by the garage mechanics for servicing and maintaining Bobcats. Compliance, it argues, would require annual inspections of the lift-arm support procedures by an authorized employee. The citation reflects Kaiser's failure to do this. Again, the record is to the contrary.
Periodic inspection reports were produced.
The record shows that an internal auditing committee performed periodic inspections of the repair shops. RP (May 26, 1999) at 160; RP (May 27, 1999) at 53, 139. Also, hazard control housekeeping tours were regularly conducted. RP (May 26, 1999) at 160; RP (May 27, 1999) at 43. Hyster Equipment Company, mobile equipment safety experts, also did on-site inspections. RP (May 27, 1999) at 36; RP (June 7, 1999) at 16. Supervisors and fellow mechanics did spot checks to ensure the angle iron was wedged in tightly and safely. RP (June 11, 1999) at 111.
Again, the record amply supports the ALJ's finding of adequate periodic inspections.

SUBSTANTIAL EVIDENCE TO SUPPORT FINDINGS
The Department assigns error to several specific findings of fact.
STANDARD OF REVIEW
Again, our inquiry is whether a challenged finding is supported by substantial evidence. Nat'l Realty, 489 F.2d at 1263 n. 24.
FINDINGS
The findings generally reflect the Board's rejection of the Department's evidence and its acceptance of Kaiser's. The record supports the Board's view of the evidence. Kaiser's witnesses demonstrated that the Department's reconstruction of the accident was physically impossible. See, e.g., RP (May 27, 1999) at 113, 115; RP (June 8, 1999) at 162; RP (June 9, 1999) at 132; RP (June 11, 1999) at 26. The Department's own expert conceded that a free-falling bucket would likely cut a person in half. RP (June 7, 1999) at 84-85. Here, Mr. VanDoren suffered *333 slow compression injuries. RP (June 11, 1999) at 75.
Specifically, the Department challenges Finding 2, a narrative of the accident reconstruction adopted by the fact finder. The Department complains that the Board mixes fact with speculation about what Mr. VanDoren was doing when he died. Specifically, that he used wrenches to bypass safety features designed to prevent the bucket from descending.
Expert witnesses, however, supported this reconstruction of the accident with physical evidence. The "speculation" the Department complains of represents the fact finder's reasonable inferences from the evidence, to which we defer. William Dickson Co. v. Puget Sound Air Pollution Control Agency, 81 Wash.App. 403, 411, 914 P.2d 750 (1996).
The Department next challenges several findings that are verbatim reproductions of the Department's prehearing admissions. These include Finding 15, which recites verbatim the Department's Admission 35, that violation 1-1(a) is based on the need for "some type" of device to block gravitational energy. Also Finding 38, which includes the fact that the manufacturer's device was found on the floor at the accident scene, is Admission 74 verbatim.
The Department contends that Finding 48that the Department had never before issued a citation for using hardware other than the manufacturer'smischaracterizes the citation. But the Department admitted the essentials of this Finding in Admissions 84 and 87.
Findings 78 and 80 state that there was no genuine issue of material fact on violations 1-1a and 1-1b. These are conclusions of law relating to the summary judgment of the hardware violations, and we have already discussed them.
The Department complains that Finding 79 (Kaiser "provided sufficient protective materials and hardware ... for the purpose of isolating, securing, or blocking of machines or equipment from energy sources") misses the point by discussing the number of devices provided instead of their adequacy. It does no such thing. The ALJ merely finds that Kaiser provided what was needed to secure the bucket.
The Department correctly complains that Findings 81, 82, and 84 are no more than general statements that Kaiser met the requirements of the WACs. They basically recite the regulatory language (already discussed) to the effect that Kaiser used sufficient safety devices and adopted practices and methods which were reasonably adequate to meet the required standards. These Findings do not stand alone, however. They summarize numerous earlier particularized findings. They bring "together essential findings supporting the Board's conclusions of law that the energy-blocking hardware and procedures were adequate.
Finding 83 says that the preponderance of the evidence shows that Kaiser had in place procedures recognized by its mechanics for the use of angle iron as a gravity-blocking device. The Department characterizes this Finding as simply wrong, because Kaiser had no written procedures for using angle iron as a gravity-blocking device. The Finding does not, however, mention written procedures. It says that "work procedures" were in place for the use of angle iron and that the mechanics understood them. This doubtless reflects the fact finder's acceptance of the testimony of numerous witnesses that written procedures beyond the instruction to use them would have been superfluous. RP (May 26, 1999) at 124, 142, 162.

ATTORNEY FEES
RAP 18.1 provides for reasonable attorney fees if a party is entitled to them under applicable law. But RAP 18.1 requires the party to devote a section of its brief to identifying the applicable law relied on in its request for fees. RAP 18.1(b). This requirement is mandatory. Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wash.2d 692, 710 n. 4, 952 P.2d 590 (1998); Phillips Bldg. Co. v. An, 81 Wash.App. 696, 705, 915 P.2d 1146 (1996). The rule requires more than a bald request for fees on appeal. Thweatt v. Hommel, 67 Wash.App. 135, 148, 834 P.2d 1058 (1992). Argument and citation to authority are necessary to advise us of the *334 appropriate grounds for an award of attorney fees. Austin v. U.S. Bank of Wash., 73 Wash.App. 293, 313, 869 P.2d 404 (1994).
Kaiser makes reference to this provision of RAP 18.1, but does not explain the grounds. Kaiser may well be entitled to attorney fees on appeal. It may not. But there is no way for us to divine the answer to this question based on its brief. We do not, therefore, award fees.

CONCLUSION
We affirm the order of the superior court affirming the action of the Board.
WE CONCUR: SCHULTHEIS and KURTZ, JJ.
NOTES
[1] WAC 296-24-11005 provides:

"General.
". . . .
"(5) Protective materials and hardware.
"(a) Locks, tags, chains, wedges, key blocks, adapter pins, self-locking fasteners, or other hardware shall be provided by the employer for isolating, securing, or blocking of machines or equipment from energy sources."
[2] WAC 296-24-073 provides:

"Safe place standards.
". . . .
"(2) Every employer shall furnish and use safety devices and safeguards, and shall adopt and use practices, means, methods, operations, and processes which are reasonably adequate to render such employment and place of employment safe. Every employer shall do every other thing reasonably necessary to protect the life and safety of employees."